**STATE of South Dakota, Plaintiff and Appellee,**

v.

**Larry BRANDENBURG, Defendant and Appellant.**

No. 14152.

Supreme Court of South Dakota.

Argued Nov. 30, 1983.

Decided Feb. 29, 1984.

Richard Dale, Asst. Atty. Gen., Pierre, for plaintiff and appellee; Mark V. Meierhenry, Atty. Gen., Pierre, on brief.

Charles Rick Johnson of Johnson, Eklund & Davis, Gregory, for defendant and appellant.

FOSHEIM, Chief Justice.

Larry Brandenburg appeals a perjury conviction. We reverse and remand for a new trial.

This appeal developed from the factual background found in *State v. Wellner,* 318 N.W.2d 324 (S.D.1982). In *Wellner* we upheld the criminal convictions of Steven and Stanley Wellner for cultivation of several tons of marijuana on Hand County farmland rented from Ellwood Brandenburg, appellant's father. Appellant was then purchasing that land.

Appellant was called as a witness at the Wellners' preliminary examination on October 2, 1980. He testified in part as follows:

QUESTION: Did you know ... do you have any knowledge that any marijuana was grown on any of that land that you were purchasing from your father?

ANSWER: No, I didn't.

QUESTION: And you, yourself, did you ever see any marijuana growing there?

ANSWER: No.

The perjury conviction rests on this testimony.

Appellant unsuccessfully moved for change of venue. Media coverage of these proceedings was not unusually extensive. His assertion of county-wide bias was founded almost entirely on a survey of 201 area residents, 72 of whom signed form affidavits attesting to their belief that Brandenburg could not get a fair trial in Hand County.

We held in *State v. Wellner*, 318 N.W.2d 324, that a similar survey conducted for the Wellner defense did not require a change of venue. The Wellners exercised only one peremptory challenge during voir dire and thus failed to show that the community bias or prejudice could not adequately be exposed and remedied during voir dire. Brandenburg notes this *Wellner* dictum:

> Had this case come to us in the posture of defendants' exhausting their peremptory challenges with jurors still on the panel who had indicated a pretrial bias, followed by a refusal of the motion to change the place of trial, the result would undoubtedly be different.

*Id.* at 331. Appellant argues that his survey's showing of county prejudice, his exhaustion of peremptory challenges during voir dire and his renewed motion for change of venue justified moving the place of trial under the *Wellner* hypothetical.

■ A change of venue shall be ordered upon motion if the court is satisfied that there exists, in the county where the prosecution is pending, so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county. SDCL 23A–17–5. Generally, the law presumes that a defendant can receive a fair and impartial trial in the county in which the offense is committed. *State v. Reiman*, 284 N.W.2d 860 (S.D.1979); 21 Am. Jur.2d Criminal Law § 387 (1981). The test is whether there is, in fact, prejudice in the minds of the county residents sufficient to raise a reasonable apprehension that the accused will not receive a fair and impartial trial in that county. The burden of establishing that a fair and impartial trial cannot occur in such county is upon the applicant. Granting or refusing a change of venue

involves the discretion of the trial court, and we will reverse that decision only upon a showing of discretion abuse. *Wellner*, 318 N.W.2d 324; *Reiman*, 284 N.W.2d 860; *State v. Austin*, 84 S.D. 405, 172 N.W.2d 284 (1969).

■ Brandenburg has not established an abuse of discretion. He did not introduce evidence of unfair publicity and his survey appears to have been unscientific and self-serving. The interviews did not occur in random fashion, but, as Brandenburg's investigator conceded, the next subject to be contacted was often recommended by the person being interviewed as one likely to sign the desired statement. The State's investigation of the 72 persons who did sign affidavits revealed that: (1) seven were not residents of the county; (2) forty-six were married to each other; (3) two were appellant's sister and brother-in-law; (4) some admitted being social friends or business associates of the appellant; (5) some did not read the affidavit before signing it and others did not understand what the form affidavit said. If there was county-wide bias, it was not exposed in the voir dire examination or the showing presented. While it may have been preferable to move the place of trial to insure a higher degree of fairness, we cannot conclude from the record that the trial court abused its discretion in denying the motion for a change of venue.

■ Appellant also alleges error in the court's refusal to admit two tape recordings into evidence. The first recording was made secretly by Brandenburg on October 30, 1980, when he was talking to the former Hand County State's Attorney, who later became special prosecutor in the Brandenburg trial. Brandenburg claims the tape would have revealed to the jury that he informed the State's Attorney not to expect him to say he knew that which he had not seen. In the tape he stated:

> I'm going to go up there and say what I know, and if it is something I don't definitely know, I'm not going to say I know it one way or the other ...

It is important to note that this conversation occurred after the preliminary examination from which the perjury conviction springs. Brandenburg was then ostensibly attempting to explain to the State's Attorney why he had denied knowledge of the marijuana cultivation at the preliminary examination and why his answer would be the same at a grand jury hearing the following day and also at the upcoming trial. The court did not abuse its discretion in refusing to admit this after-the-fact explanation.

■ Brandenburg also asked leave to play the first tape to the jury to impeach the testimony of the special prosecutor and State witness Jerry Lindberg. The special prosecutor had been called as a defense witness to confirm a statement he made to Brandenburg during the tape-recorded conversation. During that taped conversation he stated:

> ... if I get a conviction [the Wellners] are going to start squealing like stuffed pigs ... They're gonna drag you in, Larry. They're out there sweet talking you all the time now. But you wait. You mark my word. When it's over and done, they ain't going to take that two years in the pen alone. They're going to try to drag other people in *and lie to do it.* I'm not saying they wouldn't lie to get you in trouble ... What's the obvious alternative? To make them think Larry Brandenburg did it. [Emphasis added]

The special prosecutor testified he did not recall saying the Wellners might lie to convict Larry Brandenburg. While this was not a denial, it was less than an admission and thus put in issue what exactly he said. Lindberg, who was present at the tape-recorded conversation, also testified he could not recall hearing him make that statement. Brandenburg and his wife were permitted to testify concerning the contents of the tape, but permission to play the tape to the jury was refused.

Without hearing the tape, the jury was asked to choose whether to believe the special prosecutor and a state witness or the accused and his wife. The stock instruction was given that, in weighing credibility, the jury could take into consideration the interest of the witness in the result of the case. Since the defendant and his wife obviously had a great interest in the verdict, only the tape could objectively impeach the testimony of the special prosecutor and Lindberg. It was relevant. It was not collateral, but bore directly on the credibility of the evidence supporting the perjury charge. Because the recording existed, it was the evidence required to establish the special prosecutor's statement that the Wellners might lie. *See* SDCL 19–18–2. In all probability the ruling produced some effect upon the final result which adversely affected appellant's rights. Refusing the tapes into evidence thus exceeded harmless error. *K & E Land and Cattle, Inc. v. Mayer,* 330 N.W.2d 529 (S.D.1983); *Larson v. Locken,* 262 N.W.2d 752 (S.D.1978); *State Hwy. Com'n v. Beets,* 88 S.D. 536, 224 N.W.2d 567 (1974).

This taped conversation raised another problem. The trial judge ruled that he would permit the tape into evidence only if there was no objection. The special prosecutor objected because he felt his taped words might prejudice the State's case. By then objecting the special prosecutor thereby, in effect, precluded admission of the tape into evidence, a tape which may have impeached state's evidence including the testimony of the special prosecutor.

■ A prosecutor has an overriding obligation, shared by the court, to see that a defendant receives a fair trial. *State v. Sahlie* 90 S.D. 682, 245 N.W.2d 476 (1976). This burden weighs as heavily on prosecutors as it does on judge, jury and defense counsel. *State v. Gage,* 302 N.W.2d 793 (S.D.1981); *State v. Kidd,* 286 N.W.2d 120 (S.D.1979); *State v. Havens,* 264 N.W.2d 918 (S.D.1978). In this vein, we must be ever mindful that a prosecutor's duty is not simply to prosecute, but to obtain justice with a fair trial. *Id.; Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

Ethical Consideration 7–13 of the Code of Professional Responsibility set forth in SDCL 16–18, Appx., provides:

The responsibility of a public prosecutor differs from that of the usual advocate; *his duty is to seek justice*, not merely to convict. This special duty exists because: (1) the prosecutor represents the sovereign and therefore should use restraint in the discretionary exercise of governmental powers, such as in the selection of cases to prosecute; (2) during trial the prosecutor is not only an advocate but he also may make decisions normally made by an individual client, and those affecting the public interest should be fair to all; and (3) in our system of criminal justice the accused is to be given the benefit of all reasonable doubts. With respect to evidence and witnesses, the prosecutor has responsibilities different from those of a lawyer in private practice: the prosecutor should make timely disclosure to the defense of available evidence, known to him, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment. *Further, a prosecutor should not intentionally avoid pursuit of evidence merely because he believes it will damage the prosecutor's case or aid the accused.* [Emphasis added]

We do not insinuate the special prosecutor had unethical motives.* He knew in advance, however, that his objection would effectively stifle evidence, which did preclude a fair trial. Because using the tape might hurt the State's case was not a valid reason to prevent its introduction. The tape-recorded statement was important to the defense. It put in question the credibility of the Wellner brothers who had been released from prison in exchange for their testimony against Brandenburg. The trial court has a continuous responsibility to assure a fair trial. *Degen v. Bayman*, 86 S.D. 598, 200 N.W.2d 134 (1972). That responsibility may not be interrupted. It was less than continuous when the admissibility of the taped evidence was conditioned on no objection. The obligation of the trial judge to independently and objectively decide all the issues perseveres throughout all stages of the trial.

■ Brandenburg also attempted unsuccessfully to have the jury hear in its entirety a tape recording of a conversation between Brandenburg, his wife, and the two Wellner brothers, shortly after the Wellners were released from prison. The trial court permitted the jury to hear three short excerpts from a forty-five minute recording, tending to impeach Steven Wellner's denial that he told the Brandenburgs there was no substance to the charges against them and that their testimony was all the special prosecutor's idea. Although Brandenburg concedes much of the conversation was irrelevant, he maintains the jury should have been allowed to hear what was *not* said. We perceive no abuse of discretion in the refusal to play the entire tape for this purpose. The jury heard the relevant portions.

Brandenburg also claims error in the trial court's refusal to give several proposed jury instructions. Because we reverse on other grounds, we decline to discuss proposed instructions which may never reappear. *Cf. Blumhardt v. Hartung*, 283 N.W.2d 229 (S.D.1979).

Reversed and remanded for new trial.

DUNN and MORGAN, JJ., concur.

HENDERSON, J., concurs specially.

WOLLMAN, J., concurs in part and dissents in part.

HENDERSON, Justice (specially concurring).

Agreeing with the majority opinion on a reversal on the tape issue, I would also

---

* Our reference to Ethical Consideration 7–13 is not designed to chastise the special prosecutor. Rather it is an unavoidable decisional step for determining a lapse in the trial court's continuing responsibility to ensure a fair trial. In *State v. Black Feather*, 266 N.W.2d 563 (S.D.1978), for example, an attorney general's actions were placed in question only for the purpose of deciding a criminal appeal.

vote for a reversal and a new trial for appellant upon these grounds:

1. Failure of the trial court to grant a change of venue. This Court cannot now escape its language of *Wellner*, 318 N.W.2d at 331, for this appellant did exhaust all of his peremptory challenges. A motion was made thereafter to change the place of trial which was duly refused. When so ruling, the trial court had at hand the professional jury study conducted by the National Jury Project for the *Wellner* defense reflecting a 99% acquaintance with the facts. The record reflects that the trial court formally took notice of said study. This case should not have been tried in Hand County; it appears the case was so notorious that appellant could not receive a fair trial. It is significant to note that the State produced no evidence refuting the bias showing by the defense. Rather, the State attacked the method and mode of the evidence gathered by the defense. An investigator employed by appellant obtained comments of prejudice of 128 Hand County residents; rather than to document each one of these witnesses, appellant advised the trial court that each name would be tied in with each statement. Appellant further advised that the trial court need only ask and this full information would be divulged. Many of the 128 Hand County residents were fearful of having their names openly disclosed. The composite information given to the trial court was out of respect to the wishes and feelings of these Hand County people. In *Wellner*, this Court did not reject the jury study which was accomplished for that case; said jury study, by judicial notice, became a part of this record. Therefore, there was sufficient prejudice and bias in the minds of the Hand County people which raised a reasonable apprehension that appellant could not receive a fair and impartial trial in Hand County. Hand County is a small rural county in central South Dakota with a static population. When 99% of the people have knowledge of the facts, coupled with the courtroom scene that many jurors did not wish to and could not serve on the jury because of their opinions, there is a reasonable apprehension created in the reasoned mind that an impartial jury is unlikely. I would hold that there was an abuse of discretion in denying the change of venue. It is the duty of this Court, as the highest Court in this state, to partake in meaningful review. We must meaningfully address the abuse of discretion test or the order of the trial court becomes the final order relegating this Court into a superstructure perched on a foundation of nebulous perspective.

2. Failure of the trial court to remove the special prosecutor in this case when motioned to do so. It is highly improper in a criminal prosecution to permit an individual to testify to the principal facts of the case, thereafter examine witnesses and later argue the case before the jury. An attorney might well be a competent witness but he or she should disassociate that advocative role, once called as a witness. *See Frank v. State*, 150 Neb. 745, 35 N.W.2d 816 (1949), and a host of authorities thereunder collected. *See also, Newman v. Sigler*, 421 F.2d 1377, 1379 (8th Cir. 1970), *cert. denied*, 399 U.S. 935, 90 S.Ct. 2267, 26 L.Ed.2d 808 (1970), for general thesis that a jury is confused when an attorney argues in a dual capacity, not knowing if the argument is from a prosecutor or from a witness. For this reason, most courts have held that a prosecuting attorney should not be allowed to testify except in most extraordinary circumstances. 81 Am.Jur.2d *Witnesses* § 99 at 140 (1976). Here, the special prosecutor was a witness to

fundamental facts and particularly, appellant's state of mind at the time he allegedly gave perjured testimony. Pretrial motions, exposing the great probability of the special prosecutor's direct knowledge of an element of perjury, were presented with respect to this conflict and denied by the trial court.

This was error. The defense knew and the State knew that the special prosecutor had specific knowledge of the facts and possessed evidence bearing on the alleged crime. Grounded in reason, it was foreseeable that the special prosecutor would testify and that his personal involvement in the investigative gathering would come to light. As such, and other Assistant Attorney Generals being available to conduct the prosecution, the special prosecutor should not have undertaken representation of the State. *See* Code of Professional Responsibility, CANON DR 5–101, REFUSING EMPLOYMENT WHEN THE INTERESTS OF THE LAWYER MAY IMPAIR HIS INDEPENDENT PROFESSIONAL JUDGMENT. *See also,* CANON DR 5–102, WITHDRAWAL AS COUNSEL WHEN THE LAWYER BECOMES A WITNESS. SDCL 16–18, Appx. True, the special prosecutor was not called to the stand by his client, but he and his client, and the defense, knew he was a witness to certain facts in the case; therefore, he should have recused himself in favor of another Assistant Attorney General who could prosecute the action in a more objective, proficient and detached atmosphere.

WOLLMAN, Justice (concurring in part, dissenting in part).

I would hold that the trial court did not commit reversible error in refusing to admit the tape recording of the conversation between the Brandenburgs and the special prosecutor.

It is important to note that appellant's principal argument for the admissibility of the tape recording is that "the tape would have allowed the jury an opportunity to hear for themselves the fact that Mr. Bran-

denburg explicitly told the special prosecutor not to expect him to say he *knew* anything unless he had seen it with his own eyes." (emphasis in original) The court quite properly holds that this self-serving post-preliminary hearing statement was of no relevance to the perjury charge arising out of appellant's testimony at the preliminary hearing. Once this argument is disposed of, all that remains is appellant's contention that the tape would have impeached the special prosecutor's testimony that he did not recall telling appellant and his wife that the Wellners would lie. The relevant portions of the special prosecutor's testimony on this point are as follows:

DEFENSE COUNSEL: Did you ever say anything that would indicate to my client that the Wellners were likely to lie to bring them into it?

SPECIAL PROSECUTOR: I don't recall saying they would lie to bring them into it. My recollection is that I said that they were presently lying, and if I was successful in convicting them, I felt there was someone else involved and they were going to be brought in. And there is no doubt by implication, I said I thought it probably could be Larry.

DEFENSE COUNSEL: But my question, just pure and simple, is: as a final analysis, you don't recall ever making—Do you deny making any statement that you knew the Wellners would lie to bring Larry into this?

SPECIAL PROSECUTOR: I don't deny it, because I can't remember exactly what I said, but I don't recall saying it.

DEFENSE COUNSEL: That is a pretty serious accusation. It seems that you would recall if you had said something like that, wouldn't you?

SPECIAL PROSECUTOR: I was mad as hell, and I don't remember very good when I am mad. I do a lot of other foolish things sometimes when I am mad too, and I wasn't the only one made in the office.

After appellant's wife had testified regarding the circumstances under which the

tape had been made, the court held an inchambers conference during which the tape was played. The following colloquy then occurred:

> BY THE COURT: Now, the offer has been made for the admission of that tape into evidence, and does the State object?

> SPECIAL PROSECUTOR: Let me argue. I apologize to the Court. It's done me some good. I know how damn bad I sound when I am mad. I don't think my bad temper should be allowed to prejudice the State's case. I never realized I used so many bad words, and that I can't do anything about it. It's done. In the same respect, I can't see where it is relevant.

> . . . .

> SPECIAL PROSECUTOR: Your Honor, if it wasn't for the cussing, I am not particularly ashamed of what I said on the tape. I am ashamed of the cussing, but that jury may have two or three very deeply religious people that are very opposed to using blasphemy, and it is certainly going to decrease my effectiveness in this trial. Now, as you say, they can testify to it.

The trial judge then stated that he did not believe that the tape recording was prejudicial to the State or to the special prosecutor but that he would not admit the tape over the State's objection because he was of the opinion that the tape would "rouse some strong feelings and everybody is just going to be detracted from the problem at hand, the real question. I really do." Following the special prosecutor's renewal of his objection to the tape, the trial judge stated that he did not believe the statement on the recording could be used to prove the truthfulness of the Wellners and repeated his concern that the effect of the tape would only be to arouse feelings among the jurors and present the likelihood of making the whole trial a mockery.

There are at least two bases upon which to support the trial court's decision not to allow the tape recording into evidence. First, it is quite clear that the purpose for which appellant was attempting to introduce the tape was to establish that the special prosecutor had made the statement during the office interview that the Wellners would lie to try to drag other people into the case following their conviction. We should remember that it was appellant who was on trial for perjury, not the Wellners. The special prosecutor's statement during the office interview was thus related to a collateral issue. *Cf. State v. Gage,* 302 N.W.2d 793 (S.D.1981). Moreover, the special prosecutor did not deny making the statement; he merely testified that he did not recall making it. It is interesting to note that after the tape had been played in the presence of the trial court and the special prosecutor, defense counsel did not recall the special prosecutor for the purpose of giving him the opportunity to testify on the basis of his refreshed recollection. Had appellant really been concerned about establishing that the special prosecutor had made the statement, it does not appear from the record why he could not have asked the special prosecutor this question following the in-chambers playing of the tape recording.

Even if the tape recording had been related to a relevant issue at trial, the trial court was still within its discretion in refusing to admit it as an exhibit. It should be noted that the trial court ruled that the witnesses could use the tape to refresh their memories and that they could testify as to anything that was on the tape so long as it was relevant.

Even if the trial court erred in refusing to admit the tape, the error was at most harmless. *State v. Waller,* 338 N.W.2d 288 (S.D.1983). The jury had before it as an exhibit a copy of the order that released the Wellners from the state penitentiary within a month of their incarceration. This order stated in part:

> 2. This modification of the Defendants' Sentences is based upon the consideration that the Defendants have agreed to provide testimony at the Grand Jury to be convened in Hand County and at any trial against any other defendants,

said testimony to be substantially consistent with the written statement of the Defendants given to the Hand County State's Attorney previously; and the Defendants to give, if necessary, further statements to the Hand County State's Attorney to elaborate upon their previously given written statement; and the Court reserves the right to revoke this modification of sentence at any time if the Defendants fail to cooperate in good faith as agreed.

In the light of this stark evidence of the motivation for the Wellners to testify against appellant, anything that the special prosecutor may have said twenty-six months earlier concerning the Wellners pales into insignificance. If the Wellners' testimony had been the only evidence pending to prove the untruthfulness of the statements that gave rise to the perjury prosecution against appellant, the issue of the admissibility of the tape recordings might have presented a closer question. As it was, however, the State introduced testimony from two disinterested witnesses to the effect that appellant had acknowledged to them that he was aware that marijuana was growing on his father's land and that he had "stumbled across it."

I agree with the majority opinion's treatment of the other issues presented.

I would affirm the conviction.